USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 7/11/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMTRUST NORTH AMERICA, INC.
*on behalf of Technology Insurance Company, Inc.
and Security National Insurance Company,*

                Plaintiff,

– against –

SIGNIFY INSURANCE LTD.,

                Defendant.

---

SIGNIFY INSURANCE LTD.,

                Counter Claimant,

– against –

AMTRUST NORTH AMERICA, INC.,
*on behalf of Technology Insurance Company, Inc.
and Security National Insurance Company,*

                Counter Defendant.

---

SIGNIFY INSURANCE LTD.,

                Third Party Plaintiff,

– against –

SECURITY NATIONAL INSURANCE
COMPANY, TECHNOLOGY INSURANCE
COMPANY, INC.,

                Third Party Defendants.

**OPINION AND ORDER**

18 Civ. 3779 (ER)

Ramos, D.J.:

AmTrust North America, Inc., ("AmTrust"), on behalf of its underwriters, sued Signify Insurance Ltd., for breaching a reinsurance agreement by failing to provide collateral allegedly required by the agreement. Signify filed six counterclaims against AmTrust and six third-party claims against its underwriters, Technology Insurance Company, Inc., ("Technology Insurance") and Security National Insurance Company ("Security National"), on the theory that the reinsurance agreement had been rescinded or, in the alternative, that, if the reinsurance agreement was still in force, it was AmTrust and its underwriters that breached.

AmTrust moves to dismiss Signify's first and second counterclaims/third-party claims (hereinafter "counterclaims"), pursuant to Federal Rule of Civil Procedure 12(c). Doc. 33. Signify moves to dismiss AmTrust's complaint in its entirety and to grant all of its counterclaims, except its sixth counterclaim. Doc. 32. For the reasons set forth below, AmTrust's motion is GRANTED and Signify's motion is DENIED.

**I.  Background**

Employers HR, LLC ("Employers HR") provides outsourced human resources, tax and insurance services to temporary staffing agencies. Doc. 30, 6. As part of its insurance services business, Employers HR provides workers' compensation insurance to its clients' employees. *Id.* Before 2016, Employers HR contracted with a third-party insurance carrier. *Id.* In 2016, Employers HR began exploring the possibility of participating in a captive insurance program and Signify, a Bermuda captive insurance company, was formed. *Id.*

In March 2016, AmTrust, a Delaware company with a principal place of business in New York, provided Employers HR and Signify a 2016-2017 Captive Insurance Proposal. The Insurance Proposal described: (1) the terms of the policies that AmTrust would issue to

2

Employers HR; (2) the terms on which Signify would reinsure those policies in part; (3) a policy term from March 15, 2016, to March 15, 2017; (4) the states or territories in which AmTrust would issue policies; and (5) the exclusion of some clients. Doc. 36-1. Employers HR and Signify accepted the proposal. Doc. 30, 8.

On April 1, 2016, Signify and AmTrust entered into a captive reinsurance agreement (the "Reinsurance Agreement"), pursuant to which Signify agreed to reinsure a portion of the policies that AmTrust issued. Doc. 36-2.[1]

The Reinsurance Agreement imposed obligations on both Signify and AmTrust. It required Signify to provide AmTrust with "Required Security," consisting of Loss Fund collateral, Gap collateral, and any additional collateral required by law. Doc. 36-2, 6, 13. The Reinsurance Agreement required Signify to provide Gap collateral in the amount of $4,480,229 by August 31, 2016, and to increase the collateral in increments of approximately $244,376 on October 1, November 1, and December 1, 2016. *Id.* at 14. The Gap collateral was to total $5,213,358 by December 1, 2016.[2]

In turn, the Reinsurance Agreement required AmTrust to cede the "Gross Ceded Premium" and remit the "Net Ceded Premium" to Signify. Doc. 36-2, 5.[3] It also required AmTrust to issue monthly reports stating the balance due or recoverable from Signify. Doc. 36-2, 9.

---

[1] The parties signed the agreement on September 2, 2016, retroactive to April 1, 2016. Doc. 36-2, 17.

[2] The Reinsurance Agreement also provides, "If at any point in time during the term of this Agreement, the Gap collateral falls below 31.23% of Gross Written Premium, [AmTrust] can demand and [Signify] shall provide an Increase in the Gap collateral to equal 31.23% of Gross Written Premium." Doc. 36-2, 14.

[3] The Reinsurance Agreement defines "Gross Ceded Premium" as Signify's "quota share participation of Gross Written Premium less [Signify's] quota share participation of premium for the specific excess of loss and aggregate excess of loss coverage and inuring facultative reinsurance (if any)." Doc. 36-2, 5. It defines "Net Ceded Premium" as "Gross Ceded Premium less ceding commission." Doc. 36-2, 6.

3

These three general duties—the monthly reports, the collateral, and the premiums—are interdependent. AmTrust must provide monthly reports 45 calendar days from the end of each month. Signify must then fund the Loss Fund collateral within eight days after it has received the monthly report.[4] AmTrust must then remit the balance due to Signify according to the monthly reports within seven days after it has received confirmation that the letter of credit, i.e., the collateral, has been adequately increased.[5] Doc. 36-2, 14.

The Reinsurance Agreement provided three modes of termination, one of which allows either party to terminate. Doc. 36-2, 3–4. Only two, which allow only AmTrust to terminate, are relevant here. Under the first relevant ground for termination,

> [AmTrust] may terminate this Agreement, by giving thirty (30) days prior written notice to [Signify] by express, overnight, certified or registered mail, in the event any of the following occurs during the term of this Agreement: . . . [Signify] fails to provide any Required Security in accordance with the provisions of the REQUIRED SECURITY Article.

Doc. 36-2, 4.

Under the second relevant ground of termination,

> [AmTrust] may immediately terminate this Agreement if [Signify] fails to perform, satisfy or comply in any material respect with any obligation, condition or other provision contained in this Agreement, and such failure shall remain unremedied for a period of thirty (30) days after [AmTrust] shall have given [Signify] written notice thereof.

*Id.*

---

[4] "[Signify] will fund the Loss Fund collateral within 8 calendar days after [Signify's] receipt of the monthly report, by increasing the Letter of Credit by the amounts due to [Signify] reflected in the report to the extent [Signify] has not already provided such amounts." Doc. 36-2, 15.

[5] "[AmTrust] shall remit the balance due to [Signify] within 7 calendar days of [AmTrust's] receipt of confirmation from the bank that the Letter of Credit has been increased . . . ." Doc. 36-2, 15.

4

The Reinsurance Agreement describes Signify's obligations after the contract's termination:

> In the event this Agreement is terminated or expires, [Signify] shall continue to be liable for all Policies underwritten and bound prior to the termination or expiration date, and for all Policies with effective dates prior to the termination date, but issued after the Termination date, until the Policies' expiration, cancellation or non-renewal, whichever shall occur first.
>
> * * *
>
> [Signify] agrees that the Required Security will remain in place throughout the term of this Agreement and thereafter until: 1. All claims under the Policies reinsured hereunder have been closed; or 2. 3 years after the last claim has been reported under the Policies; whichever is later.

Doc. 36-2, 3, 16. The second subsection further provides that Signify "agrees that if any claim under a Policy reinsured hereunder is reported after the expiration of such Required Security, [Signify] will deliver to [AmTrust] collateral equal to the [Signify's] obligations for such claim." *Id.*

Beginning on April 1, 2016, AmTrust—through its underwriters, Technology Insurance and Security National—issued 65 workers' compensation policies to the customers of Employers HR. Doc. 30, 9–20. Each contained an expiration date of April 1, 2017. *Id.* at 25. On Approximately July 31, 2016, for reasons not provided in the pleadings, AmTrust stopped underwriting new policies for Employers HR and ignored its requests to resume issuing new policies again. *Id.* at 20.

Meanwhile, it appears that Signify was not in compliance with its obligation to post collateral. In a letter dated November 28, 2016, AmTrust's chief underwriting officer, Vance Sawamura, wrote Signify's president, Michael Easton:

> The Agreement requires Signify to post security. *See* Agreement at Art. 9.K and Art. 28. Nonetheless, Signify has failed to do so.

5

> Signify's breach substantially defeats the purpose of the
> Agreement. Accordingly, *unless* Signify posts security in full, in
> the amount of $5,915,888, which consists of $5,213,358, the
> amount set out in the Agreement, and $702,530 for the Bridge
> HRO policy, within thirty days, . . . [AmTrust] hereby terminates
> the Agreement from inception.

Doc. 34-2, 2 (emphasis added)

Two days later, on November 30, 2016, Signify caused Comerica Bank to issue standby letters of credit for $1,508,242 and $3,460,739. Docs. 36-3, 36-4. The letters designated AmTrust's underwriters, Technology Insurance and Security National, as the beneficiaries. *Id.* This sum, $4,968,981, equaled the exact amount of Gap collateral due on November 1, 2016, according to the schedule in the Reinsurance Agreement. Doc. 36-2, 14. To secure and maintain these letters of credit, Signify posted nearly $5,000,000 in collateral and paid $45,000 in fees to Comerica Bank. Doc. 30, 23.

In a letter dated December 20, 2016, Signify's president wrote to AmTrust's chief underwriting officer purporting to accept AmTrust's termination of the Reinsurance Agreement: "Signify Insurance, Ltd. ('Signify') has received your termination letter dated November 28, 2016 and hereby accepts your termination of our Agreement from Inception (4/1/2016). Please kindly return the LOC's to Comerica Bank for cancelation within the next 7 business days." Doc. 36-6.

In a letter emailed the next day, December 21, 2016, and sent by overnight delivery, AmTrust's chief underwriting officer wrote to Signify's president, ignoring Signify's "acceptance" of termination, and withdrawing its notice of intent to terminate:

> [AmTrust] acknowledges that Signify posted $4,968,981 in
> collateral by Letters of Credit issued on November 30, 2016. In
> light of Signify's partial performance, [AmTrust] withdraws its
> notice of its intent to terminate the Agreement on December 28,
> 2016 and will provide you with cession statements. Additionally, I
> note that the Agreement requires Signify to post an additional

6

> $1,306,346 in collateral, which is currently overdue. This amount represents the December 1st installment and additional collateral required due to the increase in gross written premium. As Signify is aware, this amount is subject to further change based on gross written premium. I request that Signify post the collateral that is currently overdue within thirty days.

Doc. 36-7.

Approximately 16 months later, on April 27, 2018, AmTrust, on behalf of its underwriters, filed the instant action against Signify.[6] Doc. 1. It claims that Signify breached the Reinsurance Agreement by failing to increase Gap collateral by $1,400,517, which was due on December 1, 2016, and by completely failing to pay the Loss Fund collateral, which at the time of filing, AmTrust claimed to amount to $2,094,767.33. *Id.* at 2–3. It also seeks a declaration that Signify "is required, and will remain required, to post collateral to secure its obligations pursuant to the terms of the Reinsurance Contract." *Id.* at 3–4.

On July 20, 2018, Signify answered and filed counterclaims against AmTrust and third-party claims against AmTrust's underwriters. Doc. 10. On September 27, 2018, it amended its counterclaims and third-party claims. Doc. 30, 26–32.

In its first counterclaim, Signify seeks a declaration that the Reinsurance Agreement has been "terminated, cancelled, and/or rescinded from inception;" that AmTrust or its underwriters must return the letters of credit; and that AmTrust or its underwriters must reimburse Signify for expenses associated with the Reinsurance Agreement and for any amounts drawn on the letters of credit. Doc. 30, 27.

Its second counterclaim asks the Court to rescind the Reinsurance Agreement and to return Signify to the status quo pre-contract. *Id.* at 27–28.

---

[6] Although the Court does not rely on it, AmTrust submitted evidence in opposition to Signify's motion detailing the parties' discussions about collateral and premiums over this 16-month period. Doc. 40, 13–15.

7

The third counterclaim alleges unjust enrichment and asks the Court to order AmTrust to return the letters of credit. *Id.* at 28–29.

The fourth counterclaim alleges that AmTrust breached the Reinsurance Agreement by failing to provide $11,728,166.75 in Net Ceded Premiums and $3,607,613.34 in unidentified total liabilities. Doc. 30, 29–30.

The fifth counterclaim seeks a declaration that: (1) AmTrust must pay the Net Ceded Premiums and other liabilities; (2) that Signify need not indemnify or provide collateral to AmTrust or its underwriters for any losses incurred after 12:01 a.m. on April 1, 2017; (3) that AmTrust and its underwriters return the letters the credit and reimburse Signify for any amounts drawn from the letters of credit or associated with maintaining the letters after 12:01 a.m. on April 1, 2017. Doc. 30, 32.

The sixth counterclaim alleges that AmTrust, Technology Insurance, and Security National, breached the underlying program agreement by failing to underwrite and issue new policies for Employers HR. *Id.* at 32. It argues that this breach hurt Signify because it lost out on the opportunity to receive premiums from these new policies. *Id.*

AmTrust moves for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), to dismiss Signify's first and second counterclaims. Doc. 33. Signify moves for judgment on the pleadings to dismiss AmTrust's complaint in its entirety and to grant all of its counterclaims, except the sixth counterclaim. Doc. 32.

## II. Standard[7]

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." In adjudicating a motion for judgment on the pleadings pursuant to Rule 12(c), the Court applies the same standard of review as it does to a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). Accordingly, a motion for judgment on the pleadings should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam). The Court accepts as true the pleadings' factual allegations and draws all reasonable inferences in the non-movant's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

## III. Documents Considered

For the purposes of a motion for judgment on the pleadings, the Court may consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009) (per curium). "A complaint is deemed to include any written

---

[7] In support of its six counterclaims, Signify alleges that an AmTrust executive said in November 2016 in reference to Signify, "fuck these guys" and "I want them gone." Doc. 30, 23–24. In a footnote of its memorandum in support of its motion, Signify references these allegations. Doc. 37, 8 n.2. In opposition to this motion, AmTrust introduces facts outside of the pleadings in the event that "the Court is inclined to permit Signify to rely on contested factual allegations" and "convert[] the motion into a summary judgment motion." Doc. 40, 5. In reply, Signify acknowledges that it references contested allegations in its opening brief but claims that it did not rely on these facts and, instead, relied "exclusively on *undisputed* facts in the pleadings." Doc. 42, 6 n.3. It further argues that the Court should not convert the motion into a motion for summary judgment because it disputes the facts introduced by AmTrust and should receive an opportunity to introduce evidence into the record to contest these facts. Doc. 42, 6. "A district court must convert a motion for judgment on the pleadings to one for summary judgment if the motion includes material 'outside the pleadings' and that material is 'not excluded by the court.'" *Sira v. Morton*, 380 F.3d 57, 66 (2d Cir. 2004). Signify only relies on its pleadings and not on any evidence extraneous to its counterclaims. Conversion would therfore not be appropriate here.

instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations and quotation marks omitted). As the parties agree, the Court may consider the Reinsurance Agreement, which was attached to the Complaint, and the November 28, December 20, and December 21, 2016 letters, which were quoted extensively in the counterclaims.

Furthermore, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). A contact is unambiguous if it has "definite and precise meaning, unattended by danger of misconception in the purport of the policy itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978). "[W]hen a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." *Amusement Bus. Underwriters, a Div. of Bingham & Bingham, Inc. v. Am. Int'l Grp., Inc.*, 489 N.E.2d 729, 732 (N.Y. 1985). The Reinsurance Agreement is unambiguous and the Court interprets it as a matter of law. The Court does not consider materials, introduced for the first time during briefing, to interpret this clear contract.

## IV. Discussion[8]

AmTrust claims that Signify breached the Reinsurance Agreement and Signify argues that the Reinsurance Agreement either has been rescinded or, in the alternative, that AmTrust has breached it.

To succeed on a breach of contract claim under New York law, a party must establish (1) the existence of a valid contract among the parties, (2) performance by the party, (3) non-performance by the other party and (4) damages. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted); *see also Flomenbaum v. N.Y. Univ.*, 890 N.Y.S.2d 493, 502 (App. Div. 1st Dep't 2009) (explaining same), *aff'd*, 929 N.E.2d 403 (N.Y. 2010).

The Court's discussion of whether a valid contract exists resolves Signify's first three counterclaims because these claims for declaratory judgment, rescission, and unjust enrichment all turn on whether the Reinsurance Agreement was rescinded. Doc. 30, 26–29. The Court's analysis of whether AmTrust and Signify performed under the Reinsurance Contract decides AmTrust's and Signify's remaining claims because those claims are for breach of contract and a declaratory judgment that the other party breached.[9]

### A. A Valid Contract Existed

Signify claims that there was no valid contract because the Reinsurance Agreement had been rescinded. A contract may be rescinded unilaterally "for such a breach as substantially

---

[8] The Court applies New York law. "A federal court sitting in diversity must apply the choice of law rules of the forum state, in this case New York." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1538 (2d Cir. 1997). "Under New York law, courts will generally enforce choice-of-law clauses, because contracts should be interpreted so as to effectuate the parties' intent." *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) (internal quotation marks and citations omitted). The Court hears this case in diversity jurisdiction and the Reinsurance Agreement provides that the "Agreement and all proceedings pursuant thereto will be governed by the law of the State of New York." Doc. 36-2, 10.

[9] This does not include Signify's sixth counterclaim because it has not moved for judgment on that claim.

11

defeats its purpose," *Callanan v. Powers*, 92 N.E. 747 (N.Y. 1910), and mutually if the parties agree to rescind it. *Dolansky v. Frisillo*, 92 A.D.3d 1286, 1287 (N.Y. App. Div. 2012).

1. **Unilateral Rescission**

Signify makes two unilateral rescission arguments. First, it claims that AmTrust unilaterally rescinded the Reinsurance Agreement when it sent the November 28 letter, which stated that Signify had breached by failing to post security and that it would terminate the Agreement if Signify failed to cure the breach. Signify claims this letter rescinded the Reinsurance Agreement because it uses phrases associated with rescission, such as "from inception" and "substantially defeats the purpose of the Agreement," and because the letter uses the present tense phrase "hereby terminates." Doc. 41, 22–23.

The Court disagrees and finds that a reasonable person can only read the letter as a request to cure, known as a "dunning letter": by its unambiguous terms, the letter indicates that AmTrust will terminate the Agreement *unless* Signify posts the required collateral. Moreover, "[c]ase law does not support the proposition that a letter by itself, absent some consideration or other compelling circumstances, is sufficient to effect a rescission of a [contract]." *Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.*, 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001). Furthermore unilateral "rescission of a contract is an extraordinary remedy," *Nolan v. Sam Fox Pub. Co.*, 499 F.2d 1394, 1397 (2d Cir. 1974), and "[s]uch relief, lying in equity, is a matter of discretion." *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972).[10]

---

[10] Signify also claims that the "relationship was unhappy" and that AmTrust had a financial interest in terminating the Agreement because it owed Signify millions of dollars under the Agreement. Doc. 41, 23–24. Signify relies on *Invengineering, Inc. v. Foregger Co.*, a Third Circuit case that found that a party's actions evinced an intention to rescind the contract and that rescission was in the party's financial interests. 293 F.2d 201, 204 (3d Cir. 1961). In that case, the party "disclaimed any right to enforce the contract or to obtain damages," and sought to recover the materials that it had provided under the contract. *Id.* Here, Signify has not alleged any analogous facts to suggest that AmTrust sought to rescind the contract. Indeed, it is Signify—not AmTrust—that seeks to rescind the Reinsurance Agreement and AmTrust seeks to compel compliance. In this situation, it is not for the Court to decide

Second, Signify claims that it can unilaterally rescind the Reinsurance Agreement because AmTrust repudiated the Reinsurance Agreement by attempting to terminate it from the inception even though the Reinsurance Agreement did not explicitly provide that right. Doc. 37, 21. Under New York law, if a party "was entitled to consider [another party's] defective notice of cancellation an anticipatory repudiation of the contract," "the [party] could elect either to treat the repudiation as a breach and rescind the contract, or to await the expiration of the time for the plaintiff's performance and bring an action thereafter." *Velazquez v. Equity LLC*, 28 A.D.3d 473, 474 (N.Y. App. Div. 2006). Here, as explained above, Signify has not alleged that AmTrust improperly canceled the Reinsurance Agreement. Instead, Signify alleges that AmTrust identified Signify's noncompliance and threatened to terminate the Reinsurance Agreement if Signify did not cure the defect. Because AmTrust's November 28 letter merely sought to enforce the Reinsurance Agreement, it did not give Signify the right to rescind the Reinsurance Agreement.[11]

## 2. Mutual Rescission

Signify also claims that the parties mutually rescinded the contract. In making this argument, Signify assumes two things: first, it assumes that AmTrust's November 28 letter

---

whether rescission is in AmTrust's best interests, especially in light of AmTrust's repeated attempts to enforce the contract.

[11] Signify argues that AmTrust does not address this specific theory of rescission in its response—the theory that AmTrust's letter amounts to a breach that justifies rescission. Signify claims that "[f]or that additional reason, judgment should be granted to Signify," relying on *Jianjun Chen v. 2425 Broadway Chao Rest., LLC*, No. 1:16 Civ. 5735-GHW, 2017 WL 2600051, at *8 (S.D.N.Y. June 15, 2017) ("By failing to address [defendant's] arguments in support of dismissing the claims for breach of implied contract, Plaintiffs are deemed to have withdrawn or abandoned those claims."). As evidenced by the quotation, the plaintiff in that case failed to address defendant's motion to dismiss with respect to an *entire claim*. Here, AmTrust did not respond to a specific argument for rescission. As a result, that caselaw does not apply here.

amounted to an offer to rescind the Reinsurance Agreement. Doc. 37, 20. Second, it assumes that its December 20 letter accepted this offer. *Id.*

This argument fails because it misconstrues the terms of AmTrust's November 28 letter. As explained above, AmTrust merely threatened to rescind the Reinsurance Agreement and AmTrust had complete discretion to seek rescission, with or without Signify's consent. "[A] mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer." *Brunner-Booth Fotochrome Corp. v. Kaufman*, 18 A.D.2d 160, 164 (N.Y. App. Div. 1963).

Without an offer, there was no acceptance because Signify "could not accept what was not offered." *Gram v. Mut. Life Ins. Co. of New York*, 91 N.E.2d 307, 311 (N.Y. 1950). As a result, Signify has not established that mutual rescission occurred after the exchange of letters.[12]

Because Signify has not established that the Reinsurance Agreement was rescinded, its motion for judgment on its first three counterclaims is DENIED. For the same reason, AmTrust's motion to dismiss Signify's first two counterclaims is GRANTED.

## B. Signify did not Perform under the Reinsurance Agreement

AmTrust has sufficiently plead that Signify has not adequately performed under the Reinsurance Agreement. The Reinsurance Agreement mandated that Signify post Loss Fund collateral. Doc. 36-2, 6. The Agreement also required Signify to provide Gap collateral to

---

[12] AmTrust argues, in the alternative, that even if the November 28 letter qualified as an offer to rescind the contract, AmTrust withdrew it by accepting the benefits of the contract, in this case, the letters of credit. Doc. 35, 6. This argument derives from its interpretation of *Clearview Concrete Prod. Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461, 466 (N.Y. App. Div. 1982) and *Cammack v. J.B. Slattery & Bro.*, 148 N.E. 781, 782 (N.Y. 1925). In both cases, defendants claimed that they owed no duties under the contracts because they had rescinded the contracts by notice and in both cases, the New York courts had rejected these arguments because they had, despite their notices, accepted benefits under the contracts. *Id.* These cases do not apply here, where no party has raised the *defense* that *they* rescinded the agreement. AmTrust also argues, in the alternative, that the Court should not rescind the Reinsurance Agreement because there is no evidence that the parties abandoned it. Doc. 35, 15–16. The Court need not address this issue because Signify has not claimed that abandonment justifies rescission.

AmTrust in the amount of $4,480,229 by August 31, 2016, and to increase the collateral in increments of approximately $244,376 on October 1, November 1, and December 1, 2016. Doc. 36-2, 6, 13, 14. In its complaint, AmTrust claims that the collateral is underfunded by $3,495,284.33. Doc. 1, 2. Signify has not claimed that it provided all of that collateral.

Because Signify has not established that it performed under the Reinsurance Agreement, its motion to grant its fourth and fifth counterclaims for breach of contract and for declaratory judgment is DENIED. For the same reasons its motion to dismiss AmTrust's claims is DENIED.

## C. AmTrust's Performance under the Reinsurance Agreement

Signify claims that AmTrust performed inadequately under the Reinsurance Agreement by failing to return collateral, demanding additional collateral, and refusing to make premium payments.

### 1. Collateral

By its terms, the Reinsurance Agreement expired on March 31, 2017, and all policies issued under it expired on April 1, 2017. However, according to the Reinsurance Agreement, Signify has a continuing obligation to post collateral beyond the Agreement's expiration:

> [Signify] agrees that the Required Security will remain in place throughout the term of this Agreement and thereafter until: 1. All claims under the Policies reinsured hereunder have been closed; or 2. 3 years after the last claim has been reported under the Policies; whichever is later.

Doc. 36-2, 16. That subsection further provides that Signify "agrees that if any claim under a Policy reinsured hereunder is reported after the expiration of such Required Security, [Signify] will deliver to [AmTrust] collateral equal to [Signify's] obligations for such claim." *Id.* Signify has not alleged, let alone shown, that all claims under the policies have been closed or that three years have passed after the last claim filed. As a result, Signify has not established, pursuant to

15

the Reinsurance Agreement, that AmTrust must return the Required Security or that AmTrust has breached the Reinsurance Agreement for failing to do so.[13]

## 2. Premiums

Under the Reinsurance Agreement, AmTrust agreed to cede the "Gross Ceded Premium" and remit the "Net Ceded Premium" to Signify. However, these duties arise only after a series of events. Indeed, the Reinsurance Agreement provides that AmTrust "shall remit the balance due to [Signify] within 7 calendar days of [AmTrust's] receipt of confirmation from the bank that the Letter of Credit has been increased as set forth" above. Doc. 36-2, 15. Signify has not alleged that it has posted the Loss Fund capital. As a result, under the contract, AmTrust's duties to cede the "Gross Ceded Premium" and to remit the "Net Ceded Premium" to Signify never arose.[14]

Because Signify has not established that AmTrust performed inadequately, its motion to grant its fourth and fifth counterclaims for breach of contract and for declaratory judgment is DENIED. For the same reasons its motion to dismiss AmTrust's claims is DENIED.

## V. Conclusions

For the reasons stated above, it so ORDERED that:

---

[13] Signify reads a different portion of the Reinsurance Agreement, Article 3, to mean that it has no liability after the policies' expiration and that, because it has no liability for the policies' after their expiration, it need not post collateral at that time. Doc. 37, 26–27. This provision, however, refers to liability—not obligations that it acquired during the policy period, the matter at issue here. Moreover, this interpretation contravenes the second provision that "[Signify] agrees that the Required Security will remain in place throughout the term of this Agreement and *thereafter*." Doc. 36-2, 16 (emphasis added). Under New York law, "a contract should be construed as a whole with all parts to be given effect" and "here unambiguous, the contract language should be given its plain and ordinary meaning." *Town of Wawarsing v. Camp, Dresser & McKee, Inc.*, 49 A.D.3d 1100, 1102 (N.Y. App. Dep't 2008). As a result, the Court rejects this proposed interpretation.

[14] Signify claims that AmTrust must cede and remit the premiums because Signify paid a portion of the required Gap collateral. Doc. 42, 13. This argument misconstrues the Reinsurance Agreement because AmTrust's duty only arises after Signify posts the Loss Fund capital—not just a portion of the Gap collateral. Signify also claims that the Court should not read the Reinsurance Agreement to condition these payments on the posting of collateral because Signify need not post any collateral. Doc. 42, 14. For the reasons discussed above, the Court rejects this argument and finds that Signify's collateral obligations continue.

1. AmTrust's motion to dismiss Signify's first and second counterclaims is GRANTED. Accordingly, Signify's motion for judgment on the pleadings to grant judgment on its first and second counterclaims is DENIED as moot.

2. Signify's motion to dismiss AmTrust's two claims, for breach of contract and declaratory judgment, is DENIED.

3. Signify's motion to grant judgment on its third counterclaim for unjust enrichment is DENIED.

4. Signify's motion to grant judgment on its fourth counterclaim for breach of contract is DENIED.

5. Signify's motion to grant judgment on its fifth counterclaim for declaratory judgment is DENIED.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 32, 33, 44, 45. The parties are directed to appear for a conference on July 25, 2019, at 10:00 a.m.

Dated: July 11, 2019
New York, New York

_____
Edgardo Ramos, U.S.D.J.