UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMTRUST NORTH AMERICA, INC. *on behalf of Technology Insurance Company, Inc. and Security National Insurance Company*,

        Plaintiff,

– *against* –

SIGNIFY INSURANCE LTD.,

        Defendant.

SIGNIFY INSURANCE LTD.,

        Counter Claimant,

– *against* –

AMTRUST NORTH AMERICA, INC. *on behalf of Technology Insurance Company, Inc. and Security National Insurance Company*,

        Counter Defendant.

SIGNIFY INSURANCE LTD.*,*

        Third Party Plaintiff,

– *against* –

SECURITY NATIONAL INSURANCE COMPANY, AND TECHNOLOGY INSURANCE COMPANY, INC.,

        Third Party Defendants.

**OPINION & ORDER**

18 Civ. 3779 (ER)

RAMOS, D.J.:

AmTrust North America, Inc. ("AmTrust"), on behalf of its underwriters, sued Signify Insurance Ltd. ("Signify"), for breaching a reinsurance agreement by failing to provide collateral allegedly required by the agreement. Signify filed six counterclaims against AmTrust and six third-party claims against its underwriters, Technology Insurance Company, Inc. ("Technology Insurance") and Security National Insurance Company ("Security National"), on the theory that the reinsurance agreement had been rescinded or, in the alternative, that, if the reinsurance agreement was still in force, it was AmTrust and its underwriters that breached. On July 11, 2019, the Court granted AmTrust's motion to dismiss two of Signify's counterclaims/third-party claims (hereinafter, "counterclaims"), and denied Signify's motion to dismiss AmTrust's complaint in its entirety and to grant all of its counterclaims except its sixth counterclaim. *See AmTrust N. Am., Inc. v. Signify Ins. Ltd.*, No. 18 Civ. 3779 (ER), 2019 WL 3034891 (S.D.N.Y. July 11, 2019) (hereinafter, the "Opinion and Order").

Before the Court is AmTrust's pre-discovery motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, seeking entry of judgment on behalf of AmTrust against Signify on AmTrust's complaint and dismissing Signify's counterclaims in their entirety. Doc. 50. Also before the Court is Signify's motion for leave to file a sur-reply. Doc. 71. For the following reasons, both motions are GRANTED.

I. BACKGROUND

   A. Factual Background[1]

The Court assumes familiarity with its prior Opinion and Order. The facts below are only those necessary to resolve the motion at hand.

Employers HR, LLC ("Employers HR") provides outsourced human resources, tax and insurance services to temporary staffing agencies. Doc. 65 ¶ 2. As part of its insurance services business, Employers HR provides workers' compensation insurance to its clients' employees. *Id.*

---

[1] These facts are taken from the parties' Rule 56.1 Statements of Fact. They are undisputed, unless otherwise stated.

In 2016, Employers HR began exploring the possibility of obtaining a captive insurance program, and Signify, a Bermuda captive insurance company, was formed. *Id.* ¶ 3.

On March 18, 2016, Employers HR and Signify entered into an agreement with AmTrust, a Delaware company with a principal place of business in New York (the "Program Agreement"). *Id.* ¶ 5. Pursuant to the Program Agreement, AmTrust agreed that Technology Insurance and Security National would underwrite and issue certain insurance policies to Employers HR, which would be reinsured by Signify. *Id.* The Program Agreement had an estimated gross written premium of $9,062,903. Doc. 52, Ex. 6 ¶ 5.1. In relevant part, it required Employers HR to maintain two types of security designated as "Required Security": (1) Loss Fund collateral, and (2) Gap collateral. *Id.* ¶ 11. Loss Fund collateral was defined as "equal to net ceded premium, less: (i) captive manager fee, if any; and (ii) Reinsurer's proportional share of paid Ultimate Net Loss (as defined in the Reinsurance Agreement) and the working claim account." *Id.* Gap Collateral was defined as "the difference between [Signify's] aggregate retention and the Loss Fund." *Id.* The Program Agreement was made subject to the further execution of a captive reinsurance agreement (the "Reinsurance Agreement"). *Id.* ¶ 13.

According to Signify, "AmTrust agreed that it would issue insurance policies in good faith to all Employers HR clients that satisfied AmTrust's underwriting guidelines." Doc. 65 ¶ 5. Beginning on April 1, 2016, AmTrust—through its underwriters, Technology Insurance and Security National—issued 66 workers' compensation policies to the customers of Employers HR. Doc. 52, Ex. 4 ¶¶ 17–82. Each contained an expiration date of April 1, 2017. *Id.* At the outset, AmTrust approved new policies within 24–48 hours. Doc. 65 at 19. In April alone, AmTrust approved and issued nine policies for Employers HR and did not decline any submissions. *Id.*

In June 2016, AmTrust hired Chris Foy as its new president of underwriting. *Id.* at 20. During June and July, Employers HR submitted six prospective accounts for underwriting that were rejected, despite satisfying AmTrust's underwriting guidelines. *Id.* at 19. Employers HR had several phone calls with AmTrust to inquire as to why these new policies were being

3

declined, but did not receive any affirmative answers. *Id.* at 20. At some point that summer, Signify maintains that it was ultimately advised that AmTrust was no longer interested in writing business for Employers HR, and that this change of heart was driven by Foy. *Id.* Because of these declinations, Employers HR began submitting requests for more conservative accounts—for example, smaller clients with lower profit margins—beginning in August 2016. *Id.* at 19–21. During a conversation on September 30, 2016 Amtrust advised Signify that it was no longer comfortable with the types of accounts Employers HR had previously submitted and that it was looking to exit the business of underwriting those types of policies. *Id.* at 21. Several of Employer HR's business competitors who had agreements with AmTrust experienced the same treatment. *Id.*

Signify and AmTrust proceeded to execute the Reinsurance Agreement on September 26, 2016, with a term of April 1, 2016 through March 31, 2017. Doc. 65 ¶¶ 6, 8. Pursuant to that agreement, Signify agreed to reinsure a portion of the policies that AmTrust issued. *Id.* ¶ 7. Under the Reinsurance Agreement, AmTrust was to issue regular reports setting forth the balance due or recoverable from Signify, and Signify was bound by "all loss settlements." *Id.* ¶¶ 9–10. The Reinsurance Agreement provided three modes of termination, one of which, as relevant here, allowed AmTrust to terminate the contract on thirty days' notice in the event of a material breach. *Id.* ¶ 19. The agreement described Signify's obligations after the contract's termination:

> In the event this Agreement is terminated or expires, [Signify] shall continue to be liable for all Policies underwritten and bound prior to the termination or expiration date, and for all Policies with effective dates prior to the termination date, but issued after the Termination date, until the Policies' expiration, cancellation or non-renewal, whichever shall occur first.
>
> * * *
>
> [Signify] agrees that the Required Security will remain in place throughout the term of this Agreement and thereafter until: 1. All claims under the Policies reinsured hereunder have been closed; or 2. 3 years after the last claim has been reported under the Policies; whichever is later.

Doc. 52, Ex. 8 at Art. 3, Art. 28.L. The second subsection further provided that Signify "agrees that if any claim under a Policy reinsured hereunder is reported after the expiration of such

Required Security, [Signify] will deliver to [AmTrust] collateral equal to the [Signify's] obligations for such claim." *Id.* at Art. 28.L.

The Reinsurance Agreement also contained security provisions substantially similar to those adopted by the Program Agreement. Doc. 65 ¶¶ 6, 11. For example, it required Signify to provide AmTrust with "Required Security," consisting of Loss Fund collateral, Gap collateral, and any additional collateral required by law. *Id.* ¶ 12. The "Loss Fund" was defined as "an amount equal to the Net Ceded Premium less Reinsurer's proportional share of paid Ultimate Net Loss hereunder." *Id.* ¶ 13. Signify characterizes the Loss Fund as "consist[ing] of the premiums to which Signify would be entitled as reinsurer of the policies." *Id.* at 21. In other words, "AmTrust would pay claims on the policies out of these funds, and the Reinsurance Agreement contemplated that AmTrust would cede these premiums to Signify as long as Signify posted collateral to secure AmTrust against policy claims." *Id.* Signify was not entitled to payment of any premium until seven days after it had provided the full Loss Fund collateral. *Id.* ¶ 14. As for Gap collateral, Signify was required to provide $4,480,229 by August 31, 2016, and to increase the collateral in increments of approximately $244,376 on October 1, November 1, and December 1, 2016. *Id.* ¶ 16. The Gap collateral was to total $5,213,358 by December 1, 2016. *Id.*

AmTrust selected Comerica Bank for the issuance of Letters of Credit ("LOC") to secure the required collateral. *Id.* at 21–22. Signify missed the Gap collateral payments due on both October 1 and November 1, though it disputes that AmTrust expected strict compliance with these dates.[2] *Id.* ¶ 22–23. On November 7, 2016, AmTrust wrote to Signify to advise that it had not yet received the LOCs required for the Employers HR collateral. *Id.* ¶ 25. Signify advised AmTrust that it was attempting to resolve the issue. *Id.* ¶¶ 26–27. By November 16, 2016, Signify had provided Comerica Bank with the documentation necessary to issue the LOCs. *Id.* at 21–22. For several weeks, the two companies exchanged various e-mails regarding the

---

[2] It is undisputed that Signify did not post the August 31 security. However, Signify does dispute that it was required to do so, as the Reinsurance Agreement was not executed until September 26. Doc. 65 ¶ 21.

5

delayed payments.  *Id.* ¶¶ 28–33.  On November 28, Comerica Bank advised AmTrust that it had received all the documentation necessary to issue the LOCs.  *Id.* at 22.  On that same date, AmTrust's chief underwriting officer wrote Signify's president:

> The Agreement requires Signify to post security.  *See* Agreement at Art. 9.K and Art. 28.  Nonetheless, Signify has failed to do so.  Signify's breach substantially defeats the purpose of the Agreement.  Accordingly, unless Signify posts security in full, in the amount of $5,915,888, which consists of $5,213,358, the amount set out in the Agreement, and $702,530 for the Bridge HRO policy, within thirty days, . . . [AmTrust] hereby terminates the Agreement from inception.

Doc. 52, Ex. 9.

Two days later, on November 30, 2016, Signify caused Comerica Bank to issue standby letters of credit for $1,508,242 and $3,460,739.  Doc. 36, Exs. 3–4.  The letters designated AmTrust's underwriters, Technology Insurance and Security National, as the beneficiaries.  *Id.*  This sum, $4,968,981, equaled the exact amount of Gap collateral due on November 1, 2016, according to the schedule in the Reinsurance Agreement.  Doc. 65 ¶ 38.

On December 1, 2016, AmTrust advised Signify that additional security was needed, in part for the December Gap collateral payment.  Doc. 65 ¶ 43.  That same day, Signify's president responded:  "Excellent, glad to have this behind us.  Please let us know the final number for 12/1.  We are working with [another company] to finalize additional capacity they will provide and they are also interested in the final number in order to fund."  *Id.* ¶ 44.  On December 8, 2016, AmTrust sent Signify an updated Gap collateral schedule and advised that Signify needed to post an addition $1,306,346 in security.  *Id.* ¶ 50.

In a letter dated December 20, 2016, Signify's president wrote to AmTrust's chief underwriting officer purporting to accept AmTrust's termination of the Reinsurance Agreement:  "Signify Insurance, Ltd. ('Signify') has received your termination letter dated November 28, 2016 and hereby accepts your termination of our Agreement from Inception (4/1/2016).  Please kindly return the LOC's to Comerica Bank for cancelation within the next 7 business days."  Doc. 52, Ex. 10 at 2.

In a letter emailed the next day, December 21, 2016, and sent by overnight delivery, AmTrust's chief underwriting officer wrote to Signify's president, ignoring Signify's "acceptance" of termination, and withdrawing its notice of intent to terminate:

> [AmTrust] acknowledges that Signify posted $4,968,981 in collateral by Letters of Credit issued on November 30, 2016.  In light of Signify's partial performance, [AmTrust] withdraws its notice of its intent to terminate the Agreement on December 28, 2016 and will provide you with cession statements.  Additionally, I note that the Agreement requires Signify to post an additional $1,306,346 in collateral, which is currently overdue.  This amount represents the December 1st installment and additional collateral required due to the increase in gross written premium.  As Signify is aware, this amount is subject to further change based on gross written premium.  I request that Signify post the collateral that is currently overdue within thirty days.

Doc. 65 ¶ 54.  Signify points out that neither of AmTrust's letters referenced the Loss Fund collateral.

AmTrust continued to send Signify the monthly reports required by the Reinsurance Agreement, *id.* ¶ 55, but Signify made no further Gap collateral payments, *id.* ¶ 20.  Neither has Signify ever posted Loss Fund collateral.  *Id.* ¶ 15.[3]  On at least two occasions in 2017, Signify's president inquired as to the cession payments.  *Id.* ¶ 56–60.  In response to a November 2017 inquiry, AmTrust sent Signify its monthly cession statement for the Reinsurance Agreement.  *Id.* ¶ 61.  After a series of e-mails regarding the cession payments, AmTrust sent the following e-mail to Signify:

> Per Signify's request, it used LOCs, rather than trust accounts, to secure its obligations under the Treaty.  Per my November 7, 2017 email to you, Signify is required to post an additional $1,400,517 GAP collateral.  Please note, as previously advised by Jaimi-Lynn Lombaro's [*sic*] November 15, 2017 email below, that the October 2017 cession statements show balances due to Signify of $1,646,532.12 from Technology Insurance Company and $2,686,029.20 from Security National Insurance Company.  In accordance

---

[3] Signify maintains that it was not obligated to do so, and that any failure to do so was not a material breach of either the Program Agreement or the Reinsurance Agreement because of an "offset" provision in the Reinsurance Agreement.  Doc. 65 ¶ 15.  According to this provision, Signify maintains that it was entitled to "secure its share of the Ultimate Net Loss with ceded premiums due and owing to Signify, and that AmTrust could offset its premium payments due Signify against payments Signify owes under the Agreement." *Id.* ¶¶ 12, 15.

> with Art. 28.F(l)(b) (i) & (ii) of the Treaty, Signify is obligated to increase the LOCs by those amounts and those balances cannot be released to Signify until AmTrust has received confirmation from the bank that the LOCs have been increased in the amounts required. In order to avoid legal proceedings, Signify must increase the LOCs by $5,733,078.32 no later than December 22, 2017 at the latest. Please advise when Signify expects to have the increased LOCs in place.

*Id.* ¶ 64. AmTrust continued to send collateral schedules to Signify on a regular basis, even after commencing this action. *Id.* ¶ 65. Signify has never contested the accuracy of these reports. *Id.* ¶ 69.

The current gross written premium is $6,647,522 for Technology Insurance and $14,638,788 for Security National, totaling $21,286,310. *Id.* ¶ 71. In November 2019, AmTrust advised Signify that its letter of credit to secure its obligations to Security National was $459,625.22 less than current paid losses. Doc. 52, Ex. 15 at 2. Signify's total Gap deficiency is currently $1,678,734. Doc. 65 ¶ 72.

**B. Procedural History**

On April 27, 2018, AmTrust, on behalf of its underwriters, filed the instant action against Signify. Doc. 1. It claims that Signify breached the Reinsurance Agreement by failing to increase Gap collateral by $1,400,517, which was due on December 1, 2016, and by completely failing to pay the Loss Fund collateral, which at the time of filing, AmTrust claimed to amount to $2,094,767.33. *Id.* at 2–3. It also seeks a declaration that Signify "is required, and will remain required, to post collateral to secure its obligations pursuant to the terms of the Reinsurance Contract." *Id.* at 3–4.

On July 20, 2018, Signify answered and filed counterclaims against AmTrust and third-party claims against AmTrust's underwriters. Doc. 10. On September 27, 2018, it amended its counterclaims and third-party claims. Doc. 30 at 26–32. In its first counterclaim, Signify seeks a declaration that the Reinsurance Agreement has been "terminated, cancelled, and/or rescinded from inception"; that AmTrust or its underwriters must return the letters of credit; and that AmTrust or its underwriters must reimburse Signify for expenses associated with the Reinsurance Agreement and for any amounts drawn on the letters of credit. *Id.* at 7. Its second

8

counterclaim asks the Court to rescind the Reinsurance Agreement and to return Signify to the status quo pre-contract. *Id.* at 27–28. The third counterclaim alleges unjust enrichment and asks the Court to order AmTrust to return the letters of credit. *Id.* at 28–29. The fourth counterclaim alleges that AmTrust breached the Reinsurance Agreement by failing to provide $11,728,166.75 in Net Ceded Premiums and $3,607,613.34 in unidentified total liabilities. *Id.* at 29–30. The fifth counterclaim seeks a declaration that: (1) AmTrust must pay the Net Ceded Premiums and other liabilities; (2) that Signify need not indemnify or provide collateral to AmTrust or its underwriters for any losses incurred after 12:01 a.m. on April 1, 2017; (3) that AmTrust and its underwriters return the letters the credit and reimburse Signify for any amounts drawn from the letters of credit or associated with maintaining the letters after 12:01 a.m. on April 1, 2017. *Id.* at 32. The sixth counterclaim alleges that AmTrust, Technology Insurance, and Security National, breached the underlying program agreement by failing to underwrite and issue new policies for Employers HR. *Id.* at 32. It argues that this breach hurt Signify because it lost out on the opportunity to receive premiums from these new policies. *Id.*

On November 1, 2018, AmTrust moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), to dismiss Signify's first and second counterclaims. Doc. 33. On the same day, Signify moved for judgment on the pleadings to dismiss AmTrust's complaint in its entirety and to grant all of its counterclaims, except the sixth counterclaim. Doc. 32.

On July 11, 2019, the Court granted AmTrust's motion and denied Signify's motion. *See* Opinion and Order. The Court found that a valid contract existed between the two parties, and that AmTrust had not rescinded it in its November 28 letter. *Id.* at *6–8. Instead, the Court found that this letter was a request to cure, known as a "dunning letter." *Id.* at *6. Therefore, it did not give Signify the right to rescind the Reinsurance Agreement. *Id.* at *7. The Court also found that Signify had not performed under the Reinsurance Agreement because it failed to post all of the required collateral, finding that "the Reinsurance Agreement mandated that Signify post Loss Fund collateral" and "required Signify to provide gap collateral to AmTrust." *Id.* at *8.

9

Finally, the Court rejected Signify's arguments that AmTrust had performed inadequately under the Reinsurance Agreement. *Id.* at *8–9. As the Court found, "under the contract, AmTrust's duties to cede the 'Gross Ceded Premium' and to remit the 'Net Ceded Premium' to Signify never arose." *Id.* at *9.

Signify has not yet posted the required security. On October 10, 2019, Signify advised the Court that it was insolvent. Doc. 55 at 3:20–4:6. On November 6, 2019, AmTrust advised Signify that its current security shortfall was $1,678,694 and that Signify's share of paid losses ceded by Security National exceed the line of credit Signify had provided by $459,652.22. Doc. 52, Ex. 15; Doc. 52 ¶ 18. AmTrust filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on January 15, 2020—before conducting fact discovery—seeking entry of judgment on AmTrust's complaint and dismissing Signify's remaining counterclaims in their entirety. Doc. 50.

## II.   LEGAL STANDARD

Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id* (citing *Warshawsky*, 559 F.3d at 137).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005). If the moving party meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citation omitted). However, a motion for summary judgment cannot be defeated on the basis of conclusory assertions, speculation, or unsupported alternative explanations of facts. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *see also Senno*, 812 F. Supp. 2d at 467 (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citation omitted).

Nonetheless, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (internal citations omitted).

### III.   DISCUSSION

AmTrust moves for summary judgment on its contract claim and its request for a declaration that Signify will remain required to post collateral to secure its obligations under the Reinsurance Agreement, as well as dismissal of all of Signify's remaining counterclaims. Signify has failed to address most of AmTrust's arguments, and contests solely the granting of

summary judgment on its sixth counterclaim. Although Signify contests granting pre-discovery summary judgment, it has not indicated what additional discovery it would need to raise genuine issues of material fact as to any of these claims. Fed. R. Civ. P. 56(d); *see also Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) (granting pre-discovery motion for summary judgment where, in part, "Defendants ha[d] not filed a Rule 56(f) affidavit or otherwise claimed that they lacked adequate information to oppose the motion, and thus waived any claim that adjudication of Plaintiff's motion should await further discovery"). Accordingly, for the following reasons, AmTrust's motion is GRANTED.

### A. Waived Arguments

Because Signify has failed to address AmTrust's arguments regarding all but Signify's sixth counterclaim, the Court considers these waived. *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (arguments not addressed in opposition are conceded). The Court has reviewed AmTrust's arguments and finds them meritorious. *First*, AmTrust has clearly established breach of the Reinsurance Agreement: As the Court found in its prior Opinion and Order, the Reinsurance Agreement was a valid contract between the parties, AmTrust performed its obligations under the Reinsurance Agreement by handling worker's compensation claims arising under the policies it issued to Employers HR and reporting the results to Signify, Signify breached the agreement by not posting the required collateral, and damages resulting from that breach total $1,678,732—the amount of the shortfall. *Second*, the Reinsurance Agreement, by its plain terms, states that Signify is required, and will remain required, to post collateral to secure its obligations under the contract. As such, a declaratory judgment to that effect is appropriate here. *Third*, Signify's third counterclaim is based on Signify's contention that the Reinsurance Agreement had been rescinded, an argument that the Court has already rejected. *See* Opinion and Order at *6–7. *Fourth*, Signify's fourth and fifth counterclaims fail because the Reinsurance Agreement clearly provides that Signify's obligations continue beyond the lifetime of the agreement itself, specifically until: (1) all claims under the policies have been closed, or (2) three years after the last claim has been reported

under the policies, whichever is later. Doc. 52, Ex. 8 at Art. 28.L. Accordingly, the Court grants AmTrust's motion for summary judgment on its breach of contract and declaratory judgment claims, and on Signify's third through fifth counterclaims.

### B. Signify's Claim for Breach of the Program Agreement

"Under New York law, the 'essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach.'" *LaRoss Partners, LLC v. Contact 911 Inc.*, No. 11 Civ. 1980 (ADS) (ARL), 2015 WL 2452616, at *6 (E.D.N.Y. May 21, 2015) (quoting *Canzona v. Atanasio*, 118 A.D.3d 837 (2d Dep't 2014)). A party "will not be able to prevail on its breach of contract claim unless it . . . proves, by a preponderance of the evidence, that it performed its own obligations under the contract." *Id.*; *see also Nature's Plus Nordic A/S v. Natural Organics, Inc.*, 980 F. Supp. 2d 400, 412 (E.D.N.Y. 2013) ("[I]n order to prevail on a breach of contract claim, a plaintiff must establish performance of each of its obligations under the contract, not just those obligations that the defendant previously cited as a basis for termination."). However, "[a] fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party." *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) (citing *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997)); *see also VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379 (S.D.N.Y. 2014) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." (internal quotation marks omitted) (quoting *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007)).

In its sixth counterclaim, Signify asserts that AmTrust breached the Program Agreement because "[f]rom on or about July 31, 2016 onward . . . [AmTrust] abruptly and without explanation refused to underwrite any policies reflecting new business applied for by Employers

13

HR."[4]  Doc. 52, Ex. 4 ¶ 143.  It alleges that, because of this breach, it "lost out on the benefit of its bargain, *i.e.*, the gains it would have made from reinsuring the policies that should have been issued."  *Id.* ¶ 144.  AmTrust argues that summary judgment should be granted in its favor because both Signify and Employers HR breached the Program Agreement prior to July 31, 2016 by failing to post the required security—*i.e.* the Loss fund collateral.[5]  Moreover, for the first time on reply, AmTrust argues that Signify has failed to specify any part of the Program Agreement that AmTrust allegedly breached.  Because AmTrust failed to raise this argument in its initial motion for summary judgment, Signify requests that the Court consider an April 9, 2020 letter as its sur-reply.  Doc. 71.  The Court grants this request.

1. *Breach of the Program Agreement*

According to Signify's allegations, AmTrust's failure "to in good faith underwrite and, in accordance with its guidelines, issue policies respecting new business for Employers HR was a breach of the Program Agreement."  Doc. 52, Ex. 4 ¶ 84.  In other words, "AmTrust . . . did not act in good faith in its refusal to underwrite policies."  *Id.* ¶ 143.  In opposition to AmTrust's motion, Signify has provided a declaration from its president, Michael Easton, stating that Employers HR entered into the Program Agreement with the understanding that "each prospective new client of Employers HR would be reviewed by AmTrust's insurance broker ('AmWins'), and if the new client satisfied a certain set of parameters, a policy would be underwritten immediately."  Doc. 66 ¶ 7.

However, "a plaintiff may not rely on a self-serving declaration to create a justiciable issue where none otherwise exists."  *Shron v. LendingClub Corp.*, 19 Civ. 6718 (AT), 2020 WL 3960249, at *4 (S.D.N.Y. July 13, 2020).  Here, Signify neither offers documents to support Easton's understanding (documents that, presumably, would readily be in its possession); nor

---

[4] In his declaration, Signify's president, Michael Easton, asserts that this breach actually occurred beginning in June 2016.  Doc. 66 ¶ 15.

[5] Under both the Program Agreement and the Reinsurance Agreement, Gap collateral was not due until, at the earliest, August 2016, and so Signify's failure to post Gap collateral in August could not have excused AmTrust's alleged breach in July.

14

does it identify what parameters the policies supposedly had to meet, or even which policies were ultimately denied. As AmTrust argues, Signify has not pointed the Court to any particular provision of the Program Agreement that was supposedly breached. Indeed, the Program Agreement's terms are clear. Signify does not contest that the Program Agreement is based on an estimated Gross Written Premium of $9,062,903. Neither does it contest that AmTrust exceeded this Gross Written Premium, writing policies that generated $21,286,310 in premium. By all accounts, then, AmTrust more than met its contractual obligations. Easton's declaration is insufficient to raise a question of material fact when the agreement's terms, and AmTrust's performance under those terms, are unambiguous.

    2. *Loss Fund Collateral*

Even if the Court were to have found that a question of material fact existed as to AmTrust's performance under the Program Agreement, it is undisputable that Signify materially breached the Program Agreement when it failed to post the Loss Fund collateral. Signify does not contest that it failed to post any Loss Fund collateral at any time. However, it argues that because the agreements defined the Loss Fund collateral as the same amount as the ceded premiums it, as reinsurer, would receive from AmTrust, and because AmTrust would retain these premiums if Signify did not post the collateral, AmTrust "thus would be equally as secure as if Signify had posted the collateral." Doc. 67 at 2. Furthermore, AmTrust's failure to inquire about the Loss Fund collateral, it maintains, confirms that AmTrust did not view the Loss Fund collateral as material.

Signify's interpretation of its obligations to post Loss Fund collateral does not square with the clear language of the Program Agreement. Just as the Court found that the Reinsurance Agreement was unambiguous, so too does it find that the Program Agreement is unambiguous in its collateral requirement. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). A contact is unambiguous if it has "definite and precise meaning, unattended by danger of misconception in the purport of the policy itself, and

concerning which there is no reasonable basis for a difference of opinion." *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978). Such is the case here. As is relevant, the Program Agreement unequivocally provides that:

> Employers HR is **obligated** to ensure that the following **Required Security** is maintained: (a) **Loss Fund Collateral**: Loss Fund is equal to net ceded premium, less: (i) captive manager fee, if any; and (ii) Reinsurer's proportional share of paid Ultimate Net Loss (as defined in the Reinsurance Agreement) and the working claim account. . . . .

Doc. 52, Ex. 6 at Art. 11 (emphasis added). This language leaves no room for Signify's contention that it was not required to post the Loss Fund collateral. As such, the Court finds that, as a matter of law, Signify's failure to do so constituted a breach of the Program Agreement.

Neither can it seriously be contested that Signify's breach was material. "A breach is material if it 'go[es] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract.'" *Falcon Fifty LLC*, 17 F. Supp. 3d at 379–380 (quoting *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). "[I]n most cases, the question of materiality of breach is a mixed question of fact and law—usually more of the former and less of the latter—and thus is not properly disposed of by summary judgment." *Bear, Stearns Funding, Inc.*, 361 F. Supp. 2d at 295. However, as AmTrust argues, "[t]he failure to tender payment is a material breach of a contract." *Jafari v. Wall Findlay Galleries*, 741 F. Supp. 64, 67 (S.D.N.Y. 1990). Moreover, as AmTrust notes, it is "currently owed more than $400,000 in paid losses that Signify has failed to pay, alleging that it is 'without funds.'" Doc. 70 at 2–3. This surely goes to the "root" of the parties' agreement and cannot negate AmTrust's supposed failure to more promptly alert Signify of its breach.[6] Signify's

---

[6] In the alternative, Signify argues that even if the Loss Fund collateral was a material requirement of the Program Agreement, there is an issue of fact as to whether AmTrust waived that requirement when it focused exclusively on the Gap collateral in its emails regarding the Reinsurance Agreement; and that AmTrust is barred by the election of remedies doctrine from asserting that the Loss Fund collateral provision was material because it continued to accept benefits under the Program Agreement by writing new—though more conservative—policies for several months in 2016. These arguments are also unavailing. First, there is no issue of fact as to whether AmTrust waived the Loss Fund collateral due under the Program Agreement in its e-mails regarding Signify's breaches under the Reinsurance Agreement. That correspondence did not refer to the Program Agreement at all. Second, if any party has an "election of remedies problem," it is Signify, which continued to deal with AmTrust despite its supposed breach in

failure to timely post Loss Fund collateral, then, constituted a material breach of the Program Agreement that pre-dated any supposed breach by AmTrust.

## IV. CONCLUSION

For the foregoing reasons, AmTrust's motion is GRANTED. The Clerk of Court is respectfully directed to terminate the motions, Docs. 50, 71, and to close the case.

Dated: July 22, 2020
       New York, New York

                                              EDGARDO RAMOS, U.S.D.J.

---

July of 2016, including by entering into the Reinsurance Agreement in September 2016 and posting part of the required security that November.